**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RHONDA G. MILLS,

       Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION
AS TRUSTEE FOR THE LEHMAN XS
TRUST, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-4N and
ONEWEST BANK, F.S.B., and
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.,

       Defendants.

**CASE NO.:  1:12-cv-10937-JLT**

<u>**VERIFIED AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

With

<u>**REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

<u>SUMMARY OF THE CASE</u>

      This is a case of foreclosure in which the Plaintiff asserts (1) that the Defendants

did not hold either the promissory note or the mortgage when they exercised the statutory

power of sale; (2) that the Defendants have made false representations of material fact to

the contrary; (3) that the Defendants have thereby breached the terms of both the

mortgage and the note to which the Plaintiff has at all times been a party; and (4) that in

so doing the Defendants have given rise to a number of other claims in law and equity as

set forth below.

The Plaintiff further asserts that the Defendants have committed unfair and deceptive acts and practices with regard not only to the foreclosure but by failing to honor a loan modification for which she had been approved.  Finally, the Plaintiff is seeking a number of binding declarations and is requesting, in order to maintain the status quo, that the Defendants, be enjoined from directly or through their agents taking any further action with regard to the Plaintiff's property during the pendency of this action.

It bears stating at the outset that this is not a case in which the Plaintiff is seeking to enforce the terms of the trust agreement or the assignment by which the Defendants claim to have acquired the ownership interests in the mortgage and the note; rather, her assertion is simply that the Defendants did not hold either interest when they exercised the statutory power of sale.

It bears stating as well that the sequence of events in this case have followed an unusual and convoluted path.  The Plaintiff's mortgage loan was sold by the originating lender and purportedly transferred to a securitization Trust on or before March 30, 2007.  On April 23, 2009, more than two years later, in an apparent attempt to conceal breaks in the chain of title that would have cast doubt as to the Trust's ownership of the mortgage loan (and hence the Trust's authority to exercise the power of sale in its own name), the mortgage and note were assigned *to the servicer* for the Trust.

In 2011 the servicer then foreclosed the mortgage and at the foreclosure sale *sold the property back to the Trust,* which is presently attempting to evict the Plaintiff from her home.  This has made it difficult to know in every instance whether it is the trustee or the servicer who bears responsibility for the acts alleged in this Complaint.  The Plaintiff

therefore reserves her right to adjust her allegations and Counts accordingly if warranted by information adduced through discovery or at trial.

**Only declaratory relief is sought against the Defendant, Mortgage Electronic Registration Systems, Inc.** ("MERS") as set forth in Count 22 of this Complaint. No damages are sought as against MERS. **This Complaint is submitted as of right pursuant to Fed. R. Civ. P. 15(b). Because it includes claims of fraud and the failure of several conditions precedent, it is plead with particularity in compliance with Fed. R. Civ. P. 9(b).**

<u>PARTIES</u>

1.      The Plaintiff, Rhonda G. Mills ("Mills") is a citizen of the United States and a member by decent of the Mashpee Wampanoag Tribe. She resides in the County of Barnstable, State of Massachusetts, which is in this judicial district.

2.      The Defendant, U.S. Bank, National Association, as Trustee for the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2007-4N ("U.S. Bank"), is a business entity with an address of 7993 Euclid Avenue, Cleveland, Ohio 44103.

3.      The Defendant, OneWest Bank, F.S.B. ("OneWest"), is a business entity with an address of 888 Walnut Street, Pasadena, CA 91101. OneWest is the successor to IndyMac Bank, F.S.B. ("IndyMac") and is or was, as such, the servicer of the Plaintiff's mortgage loan.

4.      The Defendant, Mortgage Electronic Registration Systems, Inc. ("MERS") is a business entity with an address of 1818 Library Street, Suite 300, Reston, VA 20190.

5.      This Court has jurisdiction pursuant to U.S.C. §1332. 28 U.S.C. §1331, 28 U.S.C. §2201, and 28 U.S.C. §1441.  The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

6.      Venue is appropriate in this judicial district under 28 U.S.C. 1391(b) because the events that gave rise to this Complaint occurred in this district.

FACTS

*Background*

7.      Mills asserts that she is the rightful owner in fee simple of real property ("property") located at 15 Emma Oakley Mills Way, Mashpee, MA 02649.

8.      Mills is Native American and a full member of the Federally recognized Mashpee Wampanoag Tribe.  **[Exhibit 1]**  The inclusion of the name "Mills" in Emma Oakley Mills Way is not accidental; the property lies on ancestral lands, the loss of which owed itself to a pattern of disadvantage, discrimination, and misfortune obscured now to most by a veneer of legality too thin to lessen the sense of loss that lingers in the collective consciousness of those Tribe members, including Mills, who seek to keep their cultural and spiritual traditions alive and continue to hold as sacrosanct the land to which they have long been connected.  The Mills property is more than simply a piece of real estate; it is for Mills and the Tribe an opportunity to hold onto a small part of what has been lost.  **[Exhibit 2]**

9.      In 2006, following an illness and subsequent personal difficulties, Mills decided to refinance the property.  She was advised by her mortgage representative to

take an interest-only loan for two and one-half years and then refinance to a fixed interest loan. She was told that the principal balance would not accumulate appreciably during this period.

10. Accordingly, on October 6, 2006 Mills executed an adjustable rate Note ("Note") to MortgageIT, Inc. ("MortgageIT"), Loan No. 40684959, with a principal amount of $376,000.00 and an initial monthly payment amount of $995.82. She was not informed that the note would or might be pooled, transferred to a Trust, and sold as a mortgage-backed security. **[Exhibit 3]**

11. MortgageIT became a wholly owned subsidiary of Deutsche Bank in January of 2007 and in May of 2011 both companies were sued by the United States under the False Claims Act for reckless mortgage lending practices and false certifications to the U.S. Department of Housing and Urban Development (HUD) in connection with the residential mortgage origination and sponsorship practices of MortgageIT. A settlement in the amount of $202.3 million was reached on May 10, 2012.

12. Also on October 6, 2006, Mills executed a fifteen-page mortgage contract ("mortgage' or "mortgage contract") with prepayment and adjustable rate riders. It bears the "MIN" number 100112065729375598, and was recorded at the Barnstable Land Court Registry October 12, 2006 as Document 1,046,427. The mortgage identifies MortgageIT as the lender and MERS as Mortgagee, solely as nominee for MortgageIT and MortgageIT's successors and assigns. **[Exhibit 4]**

13. Some eight months after signing the note and the mortgage contract, Mills received from IndyMac a statement breakdown showing an increase of approximately $14,000.00 in additional principal being added to her loan balance. Mills then realized

she could not keep up with this type of loan and applied to IndyMac for a loan modification.

14.     On or about December 31, 2008, she was informed by IndyMac that her application for a loan modification **had been accepted.**  Despite its oppressive terms, she signed the acceptance letter, had it notarized, and returned it to IndyMac.  The letter shows that her mortgage loan was already owned at the time by the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2007-4N ("Trust").  **[Exhibit 5]**

15.     Despite IndyMac's approval of the modification and Mill's compliance with the application process, OneWest, as successor to IndyMac, proceeded to exercise the power of sale and foreclose the mortgage.  IndyMac then initiated a summary process action in the Falmouth District Court in order to evict Mills from the property.  The case was subsequently tried and has been taken under advisement by the Falmouth District Court.

16.     Mills is gainfully employed, wishes to keep the property, and stands ready, willing, and able to fulfill the terms of a loan modification that is reasonable, fair, and takes into consideration the realities of today's marketplace and the circumstances surrounding this case.

17.      Moreover, during the pendency of the summary process action, the Tribe, because of the hereditary value of the Mills property and a desire that it remain within the Tribe, negotiated with U.S. Bank (as Trustee) for the purchase of the property with the intention of then deeding it back to Mills.  U.S. Bank appeared amenable to this, but only upon the condition that Mills waive any and all claims against U.S. Bank and its servicer,

OneWest—regardless of whether or not the sale actually took place.  For the reasons set forth below, Mills did not agree.

18.     Thus there are, and have at all times pertinent to this case been, reasonable alternatives to foreclosure in the form of a loan modification or the sale of the property to the Tribe.  Mills asserts that the defendants' dogged pursuit of foreclosure is therefore unjust and discriminatory, as is the continuing attempt to enforce a predatory loan.

### *The promissory note, the mortgage, and the MERS Model*

19.     Page 1 of *the note*, which identifies MortgageIT, Inc. as the lender, contains the following language:

> I understand that the ***Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments*** under this Note is called the "Note Holder" [emphasis added].

20.     The only parties named in the note are Mills and MortgageIT; it contains no mention of U.S. Bank, OneWest, or the Mortgage Electronic Registration Systems, Inc. ("MERS").

21.     Page 5 of the note bears a single endorsement, in blank, without recourse, from one Michele Jones as assistant Secretary for MortgageIT.

22.     Neither U.S. Bank nor IndyMac nor OneWest are named in the mortgage, nor does the mortgage state that it may or will be pooled, securitized, and eventually sold to investors.

23.     Page 2 of ***the mortgage contract*** ("TRANSFER OF RIGHTS IN THE PROPERTY") states, in relevant part:

> ***Borrower does hereby Mortgage, grant and convey to MERS (solely as nomine for Lender and Lender's successors and assigns***) and to the successors and

assigns of MERS, with power of sale, the following described property . . . [emphasis added].

24. There is no language in the mortgage contract to indicate, directly or by implication, that Mills gave the mortgage and power of sale to MERS individually, or that he gave the mortgage to MERS as nominee for anyone other than the lender and the lender's successors and assigns and to the successors and assigns of MERS.

25. Page 3 of the mortgage contract ("TRANSFER OF RIGHTS IN THE PROPERTY") contains the following language:

> Borrower understands and agrees that **MERS holds only legal title to the interests granted by Borrower in this Security Instrument**, but, if necessary to comply with law or custom, **MERS (as nominee for Lender and Lender's successors and assigns**) has the right: to exercise any or all **of those interests** including but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument [emphasis added].

26. There is no language in the preceding provision to indicate, directly or by implication, that MERS, as nominee, may exercise any rights other than those established in the mortgage contract or that MERS may exercise those rights on behalf of anyone other than the lender and the lender's successors and assigns.

27. MERS, the Mortgage Electronic Registration Systems, is the subsidiary of MERSCORP Inc., headquartered in Reston VA. MERSCORP, Inc. is structured as a privately held stock company, the principal owners of which are the Mortgage Bankers Association, Fannie Mae, Freddie Mac, Bank of America, Chase, CitiMortgage, American Land Title Association, and Wells Fargo. MERS, is a member-based organization made up of some 3,000 or more mortgage lenders.

28. The MERS® System is the database; MERSCORP, Inc is the operating company that owns the database. MERS is a subsidiary of MERSCORP, Inc. and serves as

the nominee mortgagee in the land records for loans registered on the MERS® System. MERS maintains a website, www.mersinc.org, through which it publishes, among other things, its Rules of Membership and its Terms and Conditions.

29.     U.S. Bank and OneWest are, and have at all times pertinent to this action been, members of MERS.

30.     As MERS members, U.S. Bank and OneWest are thoroughly familiar with the MERS Rules and Regulations, as well as the MERS Terms and Conditions of Membership.

31.     Paragraph 6 of the MERS Terms and Conditions in effect at the time the Mortgage Contract and Note were executed states, in part:

> The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the Mortgagee of record with respect to each Mortgage loan that the Member registers on the MERS® System. ***MERS shall serve as Mortgagee of record with respect to all such Mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such Mortgage loans, to any servicing rights related to such Mortgage loans, or to any Mortgaged properties securing such Mortgage loans.  MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such Mortgage loans or Mortgaged properties*** [emphasis added].

> **[Exhibit 6]**

32.     Paragraph 2 of the MERS Terms and Conditions in effect at the time the Mortgage and Note were executed states, in part:

> MERS and the Member agree that:  (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in Mortgage loans . . . **[Exhibit 6]**

33.     Rule 8(b) of the MERSCORP Rules of Membership in effect at the time the Mortgage and Note were executed states, in part:

The Member agrees and acknowledges that when MERS is identified as nominee (*as a limited agent*) of the Note owner in the Security Instrument, MERS, *as nominee, is the Mortgagee*, beneficiary, or grantee (as applicable), in the Security Instrument *on behalf of and for the benefit of the Note owner* [emphasis added].

**[Exhibit 7]**

34.     Page 63 of the MERS System Procedures Manual-Transitional (9/6/2011) (Transfer of Beneficial Rights) states, in part:

Although the MERS System tracks changes in ownership of the beneficial rights for loans registered on the MERS System, the MERS System cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee.

**[Exhibit 8]**

35.     On November 16, 2010, (then) President and CEO of MERSCORP, Inc., R. K. Arnold ("Arnold"), testified before the U. S. Senate Committee on Banking, Housing and Urban Affairs ("Senate Hearing"). The certified record of that hearing contains the following written question posed by Senator and Committee Member Richard C. Shelby and answered orally by Arnold:

**Q.2.** Is Mortgage Electronic Registration Systems (MERS) considered a nominee or mortgagee for the mortgages that it registers?

**A.2.** MERS is a mortgagee who holds the mortgage lien *in a nominee capacity for the lender and the lenders successors and assigns.* When MERS is named as mortgagee in a mortgage document, it holds the legal title to that mortgage, while the beneficial interest in that mortgage flows to the owner of the promissory note. *A MERS mortgage makes clear that MERS is acting as the nominee (agent) of the lender-the original owner of the beneficial interest in the mortgage-and holds the legal title to the mortgage in this capacity.* Mortgage law is abundantly clear that a promissory note owner may empower *an agent* with the authority to hold and enforce a mortgage lien on behalf of the note owner, and that *courts should make every effort to recognize this agency relationship.* (See Restatement (Third) Property, § 5.4, comment e) The practice of having *an agent* hold legal title to the mortgage for a note-owner long pre-dates the creation of MERS in 1995. It became a standard practice in the mortgage finance industry [emphasis added].

**[Exhibit 9]**

36.     In his written remarks submitted at the Senate Hearing, Arnold stated:

A fundamental legal principle is that the Mortgage follows the Note, which means that as the Note changes hands, the Mortgage remains connected to it legally even though it is not physically attached. In other words, the promissory Note is enforceable against the property because of the Mortgage, but the Mortgage instrument itself is not independently enforceable as a debt. ***This principle is not changed when MERS is the Mortgagee because of the agency relationship between MERS and the lender.*** An agency relationship arises where one party is specifically authorized to act on behalf of another in dealings with third persons, and the legal definition of a "nominee" is a "party who holds bare legal title for the benefit of others." Here, ***the language of the Mortgage appoints MERS as nominee, or agent, for the lender and its successors and assigns*** for the purposes set forth therein. The Mortgage also grants MERS broad rights, ***again as nominee for the lender and the lender's successors and assigns,*** "to exercise any or all" of the interests granted by the borrower under the Mortgage, "including but not limited to, the right to foreclose and sell the property; and to take any action required of the lender." ***Thus, the language of the recorded Mortgage authorizes MERS to act on behalf of the lender*** in serving as the legal titleholder under the Mortgage and exercising any of the rights granted to the lender thereunder [emphasis added].

**[Exhibit 10]**

37.     In his written remarks submitted at the Senate Hearing, Arnold stated:

***MERS acts as the designated "common agent" for the MERS member institutions in the land records***, which means that MERS holds the Mortgage lien on behalf of its members and acts ***on their behalf as Mortgagee*** [emphasis added]**.**

**[Exhibit 10]**

38.     The certified record of the Senate Hearing contains the following written question posed by Senator and Committee Member Sherrod Brown and answered orally by Arnold:

**Q.4.** Mr. Arnold, does MERS derive any revenue from foreclosures?

**A.4.** No. Neither MERSCORP, Inc. nor its subsidiary, Mortgage Electronic Registration Systems, Inc., receive any fees or other form of compensation from foreclosures. MERS derives its revenue solely from its members. MERS makes its money through an annual membership fee (ranging from $264 to $7,500) based on organizational size, and through loan registration and servicing transfer

fees. MERS charges a one-time $6.95 fee to register a loan and have Mortgage Electronic Registration Systems, Inc. serve as the common agent (mortgagee) in the land records. For loans where Mortgage Electronic Registration Systems, Inc. will not act as the mortgagee, there is only a small onetime registration fee ($0.97 ). This is known as an iRegistration. Transactional fees (ranging from $1.00 to $7.95) are charged to update the database when servicing rights on the loan are sold from one member to another. ***MERS charges no fees and makes no money from mortgage origination or payments, from the securitization or transfer of mortgages, or from foreclosures done in its name*** [emphasis added].

**[Exhibit 9]**

39.     MERS does not, in any degree, own the economic interest in the mortgage loan; it advances no monies or credit to the borrower, nor does it have any right to payments made or to the proceeds from the sale of property at foreclosure.

40.     MERS is not the "beneficial owner" of the note but merely purports to have authority to act on behalf of the current "beneficial owner" of the note.

41.     The Mortgage Contract purports to grant MERS a broad authority to act as a nominee or agent on behalf of the lender and the lender's successors and assigns with regard to the mortgage and the note.

42.     The Mortgage Contract does not explain how ownership of the mortgage is transferred from the lender to its successors and assigns—that is to say, the Mortgage Contract does not explain how the lender's successors and assigns become successors and assigns.

43.     Massachusetts General Laws c. 183, § 21 states, in its entirety:

The following "power" shall be known as the "Statutory Power of Sale," and may be incorporated in any Mortgage by reference:

(POWER.)

But upon any default in the performance or observance of the foregoing or other condition, ***the Mortgagee or his executors, administrators, successors or assigns may sell the Mortgaged premises*** or such portion thereof as may remain subject

to the Mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the Mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the Mortgage, *first complying with the terms of the Mortgage and with the statutes relating to the foreclosure of Mortgages by the exercise of a power of sale*, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the Mortgaged premises, whether at law or in equity [emphasis added].

44.     In U.S. Bank National Association v. Ibanez, 458 Mass. 637 (2011) the

Massachusetts Supreme Judicial Court explained, at pp. 646-647:

Recognizing the substantial power that the statutory scheme affords to **a Mortgage holder** to foreclose without immediate judicial oversight, we adhere to the familiar rule that *"one who sells under a power [of sale] must follow strictly its terms. If he fails to do so there is no valid execution of the power, and the sale is wholly void."* Moore v. Dick, 187 Mass. 20, 211 (1905). See Roche v. Farnsworth, 106 Mass. 509, 513 (1871) (*power of sale contained in Mortgage "must be executed in strict compliance with its terms"*). See also McGreevey v. Charlestown Five Cents Sav. Bank, 294 Mass. 480, 484 (1936) [emphasis added].

45.     Massachusetts General Laws c. 244, § 14, contains the following language:

The **Mortgagee** or person having his estate in the land Mortgaged, *or a person authorized by the power of sale*, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such Mortgagee *or person acting in the name of such Mortgagee* or person, may, upon breach of condition and without action, do all the acts authorized or required by the power . . . [emphasis added].

46.     The mortgage contract states, at page 11, ¶ 20:

The Note or a partial interest in the Note (*together with this Security Instrument*) can be sold one or more times without prior notice to Borrower [emphasis added].

47.     The mortgage contract does not state that the note or a partial interest in

the note can be sold without the mortgage.

48.     The mortgage contract states, at page 13, ¶ 22:

**Lender** shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . If the default

is not cured on or before the date specified in the notice, **Lender** at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE. . . .

If **Lender** invokes the STATUTORY POWER OF SALE, **Lender** shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by applicable Law, in the manner provided by Applicable Law [Capitalization in original, emphasis added].

49.    The mortgage contract states, at page 11, ¶ 16:

This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.

### *The Trust.*

50.    The note was subsequently sold by MortgageIT on the secondary market and earmarked to become, through a series of transfers, part of a mortgage pool deposited into the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2007-4N.

51.    According to the Trust agreement dated March 1, 2007 and on file with the Securities and Exchange Commission ("Trust agreement") the Sponsor and Seller is Lehman Brothers Holdings, Inc. (Lehman Brothers); the Depositor is Structured Asset Securities Corporation ("SASC"); and the servicers are MortgageIT Home Loans Servicing LP, IndyMac Bank, F.S.B., GMACM, and Residential Funding Company, LLC. The date on which the loans in the mortgage pool must be identified (cut-off date) is March 1, 2007. The date on which the mortgage assets, including the note and mortgage, must be transferred to the Trust ("closing date") is March 30, 2007.[1] **[Exhibit 11]**

52.    Section 2.01 (p. 63) of the Trust agreement contains the following language:

---

[1] 8-K Report (4/13/07) Ex- 4.1. http://www.secinfo.com/d12TC3.uy42.c.htm#1stPage

(b)　　In connection with such transfer and assignment, the ***Depositor does hereby deliver to, and deposit with***, or cause to be delivered to and deposited with, ***the Trustee***, and/or a Custodian acting on the Trustee's behalf, the following documents or instruments with respect to each Mortgage Loan (each a "Mortgage File") so transferred and assigned [emphasis added]:

(i)　　with respect to each Mortgage Loan, the ***original Mortgage Note endorsed without recourse in proper form to the order of the Trustee, as shown on Exhibit B-4 hereto, or in blank (in each case, with all necessary intervening endorsements, as applicable***) or with respect to any lost Mortgage Note, a lost note affidavit stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;
. . .

(vi)　　if applicable, such original intervening assignments of the Mortgage, notice of transfer or equivalent instrument (each, an "Intervening Assignment"), ***as may be necessary to show a complete chain of assignment from the originator***, or, in the case of an Intervening Assignment that has been lost, a written Opinion of Counsel delivered to the Trustee that such original Intervening Assignment is not required to enforce the Trustee's interest in the Mortgage Loans;

(c) . . .

(ii)　　With respect to each MERS Mortgage Loan, the Master Servicer, at the expense of the Depositor and with the cooperation of the Servicer, shall cause the Servicer to take ***such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.***

53.　　General Laws c. 183, § 54 states, in part:

"Note holder", the holder of a note evidencing a debt or any other obligation secured by a mortgagee; but, ***if the note holder is not the holder of record of the mortgage, the note shall contain the appropriate endorsements evidencing the transfer of ownership thereof to said holder*** [emphasis added].

**[Exhibit 11]**

54.　　Section 1.01 (p. 41) of the Trust Agreement **[see Exhibit 5]** defines a

MERS Mortgage Loan as "Any Mortgage Loan as to which the related Mortgage, or an

Assignment of Mortgage, has been or will be recorded *in the name of MERS, as nominee* for the holder from time to time of the Mortgage Note [emphasis added]."

55.     Section 9.04 (p. 140) of the Trust agreement states in part:

> The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of any Servicer (to the extent permitted in the applicable Servicing Agreement), when the Master Servicer or a Servicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan with MERS, or cause the removal from the registration of any Mortgage Loan on the MERS system, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a *Mortgage in the* name *of MERS, solely as nominee for the Trustee and its successors and assigns* [emphasis added].

**[Exhibit 11]**

56.     Section 11.06 (p. 174) of the Trust agreement states that the Trust shall be governed and construed in accordance with the laws of the state of New York. **[Exhibit 11]**

57.     N.Y. EPT. Law, § 7.2-4 (*Act of Trustee in Contravention of Trust*) contains the following language:

> If the Trust is expressed in the instrument creating the estate of the Trustee, every sale, conveyance or other act of the Trustee in contravention of the Trust, except as authorized by this article and by any other provision of law, is void.

**[Exhibit 12]**

### *The assignment and subsequent foreclosure.*

58.     U.S. Bank was not a party to the mortgage or the note but purports to have acquired by way of assignment the ownership interests in both instruments.

59.     On May 6, 2009, a document purporting to be an assignment of the Mills mortgage from MERS to OneWest was recorded with the Barnstable Land Court Registry as Document No. 1,112,946 (the "assignment").  **[Exhibit 13]**

60.     The assignment purports to have been executed and acknowledged on April 23, 2009—more than two years after the mortgage and note had been or should have been transferred to the Trust

61.     The assignment is from MERS in its own name, with no operative reference to a current mortgagee on whose behalf MERS was acting as nominee.

62.     The assignment is from MERS in its own name, despite the fact that under the Trust agreement only the depositor, SASC, was authorized to transfer the mortgage loan to the Trust and it should not have been transferred to the servicer, OneWest.

63.     The assignment is titled "Assignment of Mortgage," but its operative clause purports to assign "said Mortgage and the Note and claim secured thereby."

64.     The assignment purports to have been signed and acknowledged in Texas by one Erica A. Johnson-Seck ("Johnson-Seck"), a purported MERS "certifying officer." It was notarized by one Kal J. Haines ("Haines"), a purported notary public in the state of Texas.

65.     M.G.L. c. 183, § 54B, as amended by 2010, 282, § 2 effective November 7, 2010 applicable as provided by 2010, 282, § 7, states, in part:

> Notwithstanding any law to the contrary . . . (2) a release, partial release or assignment of mortgage . . . (4) any instrument for the purpose of foreclosing a mortgage and conveying the title resulting therefrom, including but not limited to notices, deeds, affidavits, certificates, votes, assignments of bids, confirmatory instruments and agreements of sale; or (5) a power of attorney given for that purpose or for the purpose of servicing a mortgage, and in either case, any instrument executed by the attorney-in-fact pursuant to such power, if executed before a notary public . . . ***by a person purporting to hold the position*** of

president, vice president, treasurer, clerk, secretary, cashier, loan representative, principal, investment, mortgage or other officer, agent, asset manager, or other similar office or position, including assistant to any such office or position, *of the entity holding such mortgage*, or otherwise purporting to be an authorized signatory *for such entity*, or acting under such power of attorney *on behalf of such entity*, acting in its own capacity or as a general partner or co-venturer *of the entity holding such mortgage, shall be binding upon such entity* and shall be entitled to be recorded, and no vote of the entity affirming such authority shall be required to permit recording [emphasis added].

66.     The certified record of the Senate Hearing contains the following written question posed by Senator and Committee Member Richard C. Shelby and answered orally by Arnold:

> **Q.1.** How many individuals are employed by MERS, Inc. and MERSCORP, Inc., including vice presidents, assistant secretaries, or other ''certifying officers'' designated pursuant to corporate resolution? Are these employees also employed by other organizations? If so, which ones?
>
> **A.1.** Measured by direct employment, MERSCORP, Inc. is a relatively small organization. About 50 people work for MERSCORP, Inc. in our Reston, VA, office. Hewlett-Packard and Genpact are our technology partners, and they run the database, the help desk and mailroom with an additional 150 people dedicated to the MERS account.
> . . .
> As of November 15, 2010, MERS has 20,302 certifying officers who work with the more than 31 million active loans registered on the MERS® System.

**[Exhibit 9]**

67.     The certified record of the Senate Hearing contains the following written question posed by Senator and Committee Member Sherrod Brown and answered orally by Arnold.

> **Q.3.** Mr. Arnold, your company relies on people who you refer to as ''certifying officers.'' These are people who work in companies that are members of your system and who your company grants certain authorities, such as the authority to initiate foreclosures.
> Please explain what authorities are granted to certifying officers and the mechanisms that your company has in place to monitor the performance and behavior of those officers.

**A.3.** Mortgage Electronic Registration Systems, Inc. takes the majority of its actions as the mortgagee through the use of officers commonly referred to as ''certifying officers.'' From inception, the concept of certifying officers has always been fundamental to the operations of MERS. In the white paper 1 calling for the creation of MERS, it was recognized that members would need to have a form of authority to act on behalf of MERS when MERS is the mortgagee on their behalf. That authority took the form of appointing persons (designated by the member) as officers with limited authority to take certain actions. The offices to which each of these individuals are officially appointed to are vice president and assistant secretary.

The authority granted to these officers is limited to: (1) executing lien releases, (2) executing mortgage assignments, (3) initiating foreclosures, (4) executing proofs of claims and other bankruptcy related documents (*e.g.,* motions for relief of the automatic stay), (5) executing modification and subordination agreements needed for refinancing activities, (6) endorsing over mortgage payment checks made payable to MERS (in error) by borrowers, and (7) taking such other actions and executing documents necessary to fulfill the member's servicing duties. *It is important to note that the certifying officers are the same officers whom the lenders and servicers use to carry out these same functions above for their company even when MERS is not the mortgagee* [emphasis added].

**[Exhibit 9]**

68.     MERS certifying officers perform no other work for MERS beyond the verification and signing of Mortgage and foreclosure-related documents, and they receive no compensation or other economic benefit directly from MERS.

69.     Johnson-Seck was at all relevant times employed *by OneWest and before that by IndyMac;* thus, aside from her title as a certifying officer for MERS (the purported assignor), *she was employed by the assignee.*

70.     As an employee of the assignee, OneWest, Johnson-Seck would not have been a person with authority to sign and acknowledge an assignment had it come directly from the true beneficial owner of the mortgage and not from MERS as nominee; thus she acted in clear contravention of the MERS policies and procedures.

.     71.     A reasonable and prudent individual with personal knowledge of the mortgage and note and who was acting with due diligence would not have assigned both instruments to the servicer of the Trust more than two years after the Trust had closed.

72.     Johnson-Seck was acting within the scope of her employment at the time she signed and acknowledged the assignment.

73.     In order for OneWest to service the Mills mortgage loan for U.S. BANK, U.S. BANK would have to have held the mortgage loan.

74.     ***On January 21, 2011, OneWest foreclosed the mortgage, exercised the power of sale, and sold the property at public auction to U.S. Bank—the Trustee that had, according to the PSA, already acquired ownership of the mortgage loan from the depositor, SASC, on or before March 30, 2007, more than four years earlier.*** **[Exhibit 14]**

75.     The foreclosure by OneWest was based entirely on the mortgage and power of sale it purports to have acquired by virtue of the assignment.

## COUNT 1, FAILURE TO COMPLY WITH M.G.L. c, 183, § 21.[2]

76.     Mills incorporates by reference herein paragraphs 1 through 75 of this Complaint.

77.     By its plain language, General Laws c. 183, § 21 ("§ 21") contains the following ***four conditions precedent*** to exercise of the statutory power of sale:

(a)     First, that the borrower be ***in default***;

(b)     Second, that only ***the mortgagee or his executors, administrators, successors or assigns may sell the Mortgaged premises.***

---

[2] As this Count reveals (beyond various violations of M. G. L. c. 183, §21), knowingly false representations of material fact and the non-occurrence of several conditions precedent, it is stated with particularity.

(c)     Third, that the person selling must first comply with **the terms of the mortgage**; and,

(d)     Fourth, that the person selling must first comply with **the statutes pertaining to foreclose by exercise of the statutory power of sale**.

78.     <u>The first condition</u>.  The "default" in this case was caused when OneWest and its predecessor, IndyMac, first granted Mills's request for a loan modification, albeit on draconian terms, when the loan was current or might easily have been brought current but then proceeded without further explanation to foreclose the Mortgage and bring an action to evict Mills from her home.  Therefore, by exercising the power of sale based on no "default" other than one to the creation of which OneWest itself has been a substantial contributor OneWest has again failed to comply with the terms of M.G.L. c. 183, § 21.

79.     <u>The second condition</u>.  The power of sale was exercised by OneWest. OneWest was not the original mortgagee (MortgageIT) but rather purports to have acquired the authority to exercise the power of sale as MortgageIT's successor and assign. **At no time was OneWest the successor and assign of MortgageIT.**  The reasons for this are:

(a)     MERS was not the originating lender and "beneficial owner" of the mortgage interest.  MERS has made it clear that it is not the "beneficial owner" or real holder of legal title to the secured property but merely acts as the agent or nominee for the real holder in the land office records.  Therefore, MERS could not be the successor and assign of the original mortgagee (MortgageIT) and could not, in its own name, have transferred the power of sale to OneWest; OneWest in turn did not become the lender's successor and assign.

(b)     If, despite the plain language of the assignment, MERS were deemed to have assigned the mortgage "solely as nominee for Lender and Lender's successors and assigns"—which would require the Court to substantially rewrite the assignment—**no law supports the proposition that a decision by all consecutive holders of the mortgage to use MERS as their agent or nominee somehow transfers ownership of the mortgage itself from one holder to the next.**

(c)     An assignment of mortgage is a transfer of an interest in land and must be in writing and signed by the party to be bound.  In the case of securitization, a mortgage loan must be transferred more than once before reaching the Trust.  Mills's mortgage loan was transferred more than once.

(d)     Thus absent an unbroken chain of proper written assignments of the Mortgage Contract from the originating lender through each successive holder to the current holder, ***an assignment from MERS, even as nominee for MortgageIT and MortgageIT's successors and assigns (and such an assignment does not exist in the present case) could not possibly render OneWest the successor and assign of MortgageIT.***

(e)     There is no unbroken chain of proper written assignments from one "holder" to the next, leading to the Trust; there is only one purported assignment from MERS in its own name.

(f)     Therefore OneWest was not the mortgagee when it foreclosed, and by exercising the power of sale it has failed to comply with the terms of M.G.L. c. 183, § 21.

(g)     Under New York law, Mills's mortgage loan never passed to the Trust because the transfer was in violation of the Trust Agreement.  The reasons for this are:

>   (i)     If the date of the assignment is valid, the mortgage loan did not pass to the Trust on or before the closing date.
>
>   (ii)    If the assignment is valid, it transferred a non-performing loan to the Trust.
>
>   (iii)   Regardless of when the mortgage loan passed to the Trust, if at all, ***the note*** does not bear the requisite chain of endorsements.
>
>   (iv)    Therefore the Trust did not acquire the mortgage loan and was not the mortgagee; OneWest could not, as servicer, have exercised the power of sale on its behalf; and, by exercising the power of sale, OneWest has failed to comply with the terms of M.G.L. c. 183, § 21.

80.     <u>The third condition.</u>  OneWest has further violated G. L. c. 183, § 21 ***by failing to first comply with the terms of the mortgage contract*** before attempting to exercise the power of sale.  The mortgage contract states plainly and unequivocally:

(a)     That Mills is giving the mortgage to MERS solely as nominee ***for the lender and the lender's successors and assigns***—that is to say, ***MERS*** may only

represent the lender or its successors and assigns. The Mortgage was given to no one else.

(b) That the Note may be assigned *with the mortgage*. Thus, regardless of what Massachusetts law allows, and despite the prospective effect of the Supreme Judicial Court's recent holding in Eaton, [3] *the mortgage contract expressly requires that the person exercising the power of sale must hold both the mortgage and the note.*

(c) That *only the lender may exercise the power of sale.*

81. OneWest has failed to comply with the mortgage contract in the following ways, and in such other ways as may yet be determined at trial and through discovery:

(a) *You do not and cannot become the successor and assign of a lender merely by choosing MERS as your nominee.* Without a proper written assignment of the mortgage from every consecutive owner of the mortgage, beginning with MortgageIT, *there is no successor and assign of MortgageIT with regard to Mills's mortgage.* Therefore, OneWest is not the successor and assign of MortgageIT; OneWest had no authority to exercise the power of sale; and by exercising the power of sale OneWest has breached the mortgage contract.

(b) If MortgageIT sold the note but did not properly assign the mortgage (which is the transfer of an interest in land), the ownership of the mortgage remained with MortgageIT. *The mortgage was thus separated from the note and the Trust took by assignment a mortgage contract that had been previously breached and was no longer enforceable against Mills.* OneWest compounded and furthered this breach by exercising the statutory power of sale.

(c) If the note did not pass to the Trust on or before the closing date or because it does not bear the requisite chain of endorsements established under the PSA, *the Trust is not, as a matter of New York law, the successor and assign of MortgageIT* (the lender) and OneWest has therefore breached the mortgage contract by attempting to exercise the statutory power of sale on the Trust's behalf.

(d) If the note did not pass to the Trust because it does not bear the chain of endorsements *required* by G. L. c. 183, § 54, *the Trust is not the successor and assign of MortgageIT* (the lender) and OneWest has breached the mortgage contract by attempting to exercise the statutory power of sale on the Trust's behalf.

---

[3] <u>Eaton v. Federal National Mortgage Association,</u> No. SJC-11041, slip op. (June 22, 2012).

82.    <u>The fourth condition.</u>  U.S. BANK has further violated G. L. c. 183, § 21 by *failing to comply with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale.*  The statutes in question *include but are not limited to:*

(a)    G. L. c 183, § 21 itself, which states, in relevant part: "But upon any default in the performance or observance of the foregoing or other condition, *the Mortgagee or his executors, administrators, successors or assigns* may sell the Mortgaged premises [emphasis added]."  For the reasons previously stated in this Count 1, the Trust is not the originating lender's successor and assign and OneWest had no authority to exercise the power of sale on the Trust's behalf.

(b)    G. L. c. 244, § 14 states that *the mortgagee* or person having his estate in the land mortgaged, *or a person authorized by the power of sale,* or the attorney *duly authorized by a writing under seal* may upon default exercise the power of sale.  For the reasons previously stated in this Count 1, the Trust is none of these persons and OneWest had no authority to exercise the power of sale on the Trust's behalf.

(c)    G. L. c. 244, § 35A sets forth additional acts that *a mortgagee* must perform, including but not limited to a good faith effort to negotiate and agree upon a commercially reasonable alternative for foreclosure and the provision of an affidavit of compliance with regard to that effort.  No such effort was made, nor was an affidavit properly filed by U.S. Bank or by OneWest.

(d)    G. L. c. 259, §1 makes it clear that the transfer of an interest in land must be signed by the grantor or party to be charged—which, in the present case would be *the mortgagee*.

(e)    The Note bears only a single endorsement.  G. L. c. 183, § 54 defines "Note holder" as,

> The holder of a Note evidencing a debt or any other obligation secured by a Mortgage; *but, if the Note holder is not the holder of record of the Mortgage, the Note shall contain the appropriate endorsements evidencing the transfer of ownership thereof to said holder* [emphasis added].

Therefore neither U.S. Bank nor OneWest qualifies as a note-holder.

(f)    An action in equity under the Servicemembers Civil Relief Act (SCRA)[4] must be brought by (and the requisite affidavit signed by) *the holder of a mortgage.*

---

[4] Chapter 496 of the Acts of 1990.

(g)     M. G. L. c. 183, § 30 requires that the acknowledgement of a deed outside the Commonwealth "may be made . . . before . . . a notary public appointed therefore by the governor of this Commonwealth, or, if a certificate of authority in the form prescribed by section thirty-three is attached thereto, before any other officer therein authorized to take acknowledgements of deeds.

(h)     M. G. L. c. 183, § 33 requires that with the certificate of proof there be a certificate of the secretary of state or a certificate of the clerk of a court of record. Neither additional certificate appears in the record.

(i)     M. G. L. c. 183, § 54B requires that the person signing and acknowledging an assignment must purport to be the . . . vice president . . . *of the entity holding such mortgage* [emphasis added].  Johnson-Seck purports only to sign and acknowledge on behalf of MERS, not "the entity holding such mortgage."

(j)     Should it be determined through discovery or at trial that the note was a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004, a further related statute violated by the Defendants would be M. G. L. c. 183C and U.S. Bank would, as purchaser of the loan, be subject to whatever claims Mills may have against MortgageIT vis-à-vis M. G. L. c. 183C, § 15(a).  The right to assert such a claim is hereby reserved.

(k)     Should it be determined through discovery or at trial that the foreclosure was carried out during the pendency of an application for modification through HAMP the defendant's would have contravened U. S. Department of the Treasury Supplemental directive 10-2 then in effect.  The right to assert such a claim is hereby reserved.

(l)     An affidavit of sale must show that the requirements of the power of sale and of the statute have in all respects been complied with, including those set forth in the mortgage.  M. G. L. C. 244, § 15.  The affidavit of sale fails to do so.

83.     By holding itself out as the holder of both the mortgage and the note when in fact it had taken nothing by assignment from MERS, OneWest failed to comply with the preceding statutes and therefore did not have the authority to exercise the statutory power of sale.  All subsequent acts predicated upon exercise of the statutory power of sale are therefore null and void.

84.     Alternatively, by holding itself out as the holder of both the mortgage and the note when in fact it had taken nothing by assignment from MERS, the Trust, through

its servicer, OneWest, failed to comply with the preceding statutes and therefore did not have the authority to exercise the statutory power of sale individually or through OneWest. All subsequent acts predicated upon exercise of the statutory power of sale are therefore null and void.

85.     By exercising the power of sale in spite of the fact that it failed to comply with the requirements of G. L. c. 183, § 21, OneWest, individually or as servicer for U.S. BANK, has carried out a wrongful foreclosure, thereby causing Mills to suffer direct and consequential harm for which he is entitled to all appropriate relief.

## COUNT 2, BREACH OF THE MORTGAGE CONTRACT

86.     Mills incorporates by reference herein paragraphs 1 through 85 of this Complaint.

87.     The mortgage and the note are contracts to which Mills has at all times been a party, and which Mills has every right to enforce.

88.     For the reasons previously set forth in this Complaint, and particularly those set forth in Count 1 of this Complaint, U.S. Bank and OneWest have breached the terms of both the note and the mortgage contract.

89.     Additionally, to securitize a mortgage loan—by which the individual identity of the note is necessarily lost by being homogenized into a pool consisting of thousands of other mortgage loans and then sold to investors—is to go beyond an assignment in any ordinary sense and was not within the contemplation of Mills when she signed the Mortgage and the Note.

90.     For these and any other reasons yet to be determined through discovery or at trial, U.S. Bank and OneWest have, individually or in consort, breached the express

terms of the mortgage and mote they purport to have taken by assignment; thus Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

### COUNT 3,  THE COVENANT OF GOOD FAITH AND FAIR DEALING

91.    Mills incorporates by reference herein paragraphs 1 through 90 of this Complaint.

92.    The note and mortgage contracts, which OneWest purports to have taken by assignment, each contain an implied covenant of good faith and fair dealing.

93.    For any or more of the reasons previously stated, OneWest has breached the covenant, thereby causing Mills to suffer direct, and consequential harm for which she is entitled to all appropriate relief.

### COUNT 4, UNFAIR AND DECEPTIVE ACTS AND PRACTICES

94.    Mills incorporates by reference herein paragraphs 1 through 93 of this Complaint.

95.    The acts and omissions of OneWest and U.S. Bank, as previously set forth, constitute unfair and deceptive acts and practices within the meaning of basic principles of law and equity.   Further, Mills reserves the right to seek an amendment of this Complaint to include a specific claim pursuant to M. G. L. c. 93A soon as the applicable mailing and response times have been met with regard to a formal demand.

### COUNT 5,  FAILURE OF CONDITIONS PRECEDENT

96.    Mills incorporates by reference herein paragraphs 1 through 95 of this Complaint.

97. The mortgage states expressly and unequivocally that MERS may exercise the lenders interests "*if necessary* to comply with law or custom." At no time did OneWest indicate to Mills what law or custom *necessitated* the foreclosure of her mortgage when other alternatives were available and her effort to modify was still in motion.

98. Additionally, as previously stated in Count 1 of this Complaint, M. G. L. c. 183 §21 contains four conditions precedent, none of which have occurred in the present case. In spite of this, OneWest exercised the power of sale and sold the property to the Trust that must have already owned it in order for OneWest to act as its Servicer. As a result of this convoluted and yet calculated sequence of events, Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

COUNT 6, FRAUDULENT MISREPRESENTATION AT COMMON LAW

99. Mills incorporates by reference herein paragraphs 1 through 98 of this Complaint.

100. By holding itself out to be the holder of the mortgage and the note in order to foreclose Mills's mortgage when in fact, as set forth more specifically in Count 1 of this Complaint, it held neither instrument, U.S. Bank and its Servicer OneWest have:

(a) made false representations of material fact that were susceptible of actual knowledge;

(b) done so either knowingly or with reckless disregard as to their truth or falsity;

(c) done so in order to induce Mills and others [5] to rely upon their false representations; and,

(d) thereby caused Mills and others to rely on their false representations to her detriment.

[5] These include the courts in the Servicemembers action and registry officials.

101.  Misrepresentations of material fact susceptible of actual knowledge in the present case include but are not limited to the following:

(a)     The mortgage and the note cannot have passed to the Trust in 2006 and again (through its servicer) in 2009 and then been bought by the Trust in 2011. Thus only one shell—if indeed any—conceals the pea and the others are false representations of material fact.

(b)     The mortgage and the note could not have been assigned to the Servicer on April 23, 2009 if they had not been properly assigned to the Trust on or before March 30, 2007; thus the assignment contains a false representation of material fact.

(c)     If the mortgage and the note were not assigned to the Trust on or before March 30, 2007, the attempt to assign them to the servicer on April 23, 2009 would be in contravention of the trust agreement and void as a matter of New York law; thus the assignment again contains a false representation of material fact.

(d)     If the mortgage was assigned to OneWest as servicer for the Trust rather than to OneWest individually on April 23, 2009, at a time when the mortgage loan was a non-performing loan, the assignment would have been in contravention of the trust agreement and void as a matter of New York law.  Thus the assignment again contains a false representation of material fact.

(e)     Alternatively, the mortgage and the note could not have been assigned to the Trust on or before March 30, 2007 because the mortgage was separated from the note and the note does not bear the proper chain of endorsements from originator to sponsor-seller to depositor.  As such the assignment was in contravention of the trust agreement and void as a matter of New York law.  Thus the assignment contains false representations of material fact.

(f)     Alternatively, the mortgage and the note could not have passed to the Trust on March 30, 2007 because, by the express terms of the trust agreement, *only the Depositor was authorized to make the assignment and MERS was not the Depositor.*  Thus the assignment again contains a false representation of material fact.

(g)     MERS could not, in its own name, assign either the note or the mortgage. Thus the assignment contains a false representation of material fact.

(h)     The note bears only one endorsement and it is in blank.  If its assignment was intended to be to OneWest as servicer for the Trust, the assignment fails because the note was in arrears at the time of the April 23, 2009 assignment and

was no longer a negotiable instrument. Therefore the assignment contains a false statement of material fact.

(i)     Any or all of the preceding defects were susceptible of actual knowledge. The assignment was therefore not signed and acknowledged by a person with actual knowledge as to its truth or falsity. Therefore the assignment contains a false statement of material fact.

(j)     Even if, despite the plain language of the assignment, we were to accept for argument's sake that MERS had acted as nominee for the actual mortgagee, no law stands for the proposition that the mere use of MERS as a common agent by consecutive owners of the beneficial interest in a mortgage serves to transfer the beneficial interest itself. Thus without an assignment from one consecutive owner to the next MERS has no mortgage to hold as nominee once the sale by the originating lender has taken place and its continuing designation as mortgagee in the public records is a false representation of material fact.

102.    OneWest has made misrepresentations of material fact with regard to its ownership of the mortgage and the note, has done so either knowingly or with reckless disregard as to their truth or falsity and has thereby induced Mills and third parties[6] to rely upon its misrepresentations; by the same token, U.S. Bank has done the same with regard to its ownership of the property. As a direct and proximate result, Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 7, STATUTORY FRAUD

103.    Mills incorporates by reference herein paragraphs 1 through 102 of this Complaint.

104.    The misrepresentations of material fact described in the preceding Count constitute acts of fraud within the meaning of several Massachusetts statutes, both civil and criminal, relating to title in land. These include but are not limited to M.G.L. c. 185, § 62; M.G.L. c. 185, § 45; M.G.L. c. 185, § 101; and, not least, G. L. Chapter 266, Section 35A (b) (4), which provides:

---

[6] These include the Court in the Servicemembers action and registry officials.

Whoever intentionally: files or causes to be filed with a registrar of deeds any document that contains a material statement that is false or a material omission, knowing such document to contain a material statement that is false or a material omission, shall be punished by imprisonment in the state prison for not more than 5 years or by imprisonment in the house of correction for not more than 2 and one-half years or by a fine of not more than $10,000 in the case of a natural person or not more than $100,000 in the case of any other person, or by both such fine and imprisonment.

105.   In pursuit of the foreclosure, OneWest has, with regard to its purported ownership of the mortgage and the note, made fraudulent misrepresentations in violation of Massachusetts statutory law, thus causing Mills to suffer direct and consequential harm for she is entitled to all appropriate relief.

## COUNT 8,  NEGLIGENT MISREPRESENTATION

106.   Mills incorporates by reference herein paragraphs 1 through 105 of this Complaint.

107.   In the alternative, and without waiving any claim of fraud, OneWest and U.S. Bank had a duty to exercise care and competence in communicating with Mills.

108.   OneWest and U.S. Bank, in the course of their business, have breached that duty by supplying false information concerning its ownership of the mortgage and note and concerning ownership of the property.  This false information was supplied for the guidance of Mills, the Courts, causing them to justifiably rely on that information in such a manner that it caused Mills to suffer direct and consequential damages for which they are entitled to all appropriate relief.

## COUNT 9,  COLLUSION AND CIVIL CONSPIRACY

109.   Mills incorporates by reference herein paragraphs 1 through 108 of this Complaint.

110. The securitization process is conducted for the most part beyond the horizon of public awareness and transparency, especially given the role MERS purports to play as nominee mortgagee for multiple owners of the mortgage interest. One result of this is that it is virtually impossible for the borrower to know, without forensic assistance, who actually owns the mortgage at any given time and whether or not the various transfers of ownership that occur have been properly carried out.

111. In the present case, U.S. Bank, its servicer OneWest, and such other persons as may be revealed through discovery and at trial, including individual attorneys, law firms, and foreclosure support firms, have knowingly or by reckless disregard and in consort with one another used this lack of transparency to engage in a pattern of deception in order to work the unlawful foreclosure of Mills's mortgage.

112. OneWest sold the property at a foreclosure sale to U.S. Bank, which already owned the note and mortgage by virtue of a transfer that took place from the Depositor to U.S. Bank on or before March 30, 2007.

113. Thus the only entity with the requisite ownership interests to assign the mortgage and note to OneWest on April 23, 2009 would have been U.S. Bank; yet OneWest then sold the property back to U.S. Bank at the foreclosure sale.

114. The only possible reason for the assignment to OneWest and the sale to U.S. Bank would be to conceal the existence of defects in the chain of title to U.S. Bank—defects that would impede U.S. Bank's authority to directly exercise the power of sale. Since no party would have known better the closing date of March 30, 2007 as well as the other aforementioned irregularities in this case, OneWest and U.S. Bank have acted

in collusion and engaged in civil conspiracy, thus causing Mills to suffer direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 10, INFLICTION OF EMOTIONAL DISTRESS

115.     Mills incorporates by reference herein paragraphs 1 through 114 of this Complaint.

116.     As previously described, the acts and omissions of OneWest and U.S. Bank, individually and collectively, have caused Mills to suffer severe and ongoing emotional distress with symptomatology including but not limited to sleeplessness, depression, and anxiety for which she is entitled to all appropriate relief.

## COUNT 11, CONVERSION

117.     Mills incorporates by reference herein paragraphs 1 through 116 of this Complaint.

118.     The foreclosure by OneWest and subsequent purchase by U.S. Bank were acts of conversion as a direct and proximate result of which Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 12,  UNFAIR DEBT COLLECTION PRACTICES

119.     Mills incorporates by reference herein paragraphs 1 through 118 of this Complaint.

120.     The foreclosure was an effort to collect on an alleged debt.

121.     By foreclosing without having established its ownership of the mortgage and underlying debt OneWest has, with the knowledge and approbation of U.S. Bank, engaged in unfair debt collection practices within the meaning of state and federal fair

debt collection practices and consumer protection acts and regulations, including but not limited to 15 U.S.C. § 1692; M. G. L. c. 93, § 49(c); 209 CMR 18.02; 940 C.M.R. 7.03; 15 209 CMR 18.15; and 209 CMR 18.16(10).  As a result, Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 13,  MASSACHUSETTS CIVIL RIGHTS ACT

122.     Mills incorporates by reference herein paragraphs 1 through 121 of this Complaint.

123.     Under Massachusetts common and statutory law, including but not limited to M. G. L. c. 244, § 14; M. G. L. c. 183, §§ 21, 30, 54B; 209 CMR 18.02; 940 C.M.R. 7.03; .M. G. L. c. 93, § 49(c); 209 CMR 18.15; and 209 CMR 18.16(10), as well as arts 1, 10, 12, and 30, the Declaration of Rights of the Massachusetts Constitution, Mills had the right to a foreclosure and to a collections process that was legitimate, fair, and transparent.

124.     OneWest and U.S. Bank have by threats, intimidation, and coercion, directly and through their agents interfered or attempted to interfere with any or all of the aforementioned rights in contravention of M. G. L. c. 12, §11I.  As a result, Mills has suffered direct and consequential harm for which she is entitled to relief, along with attorney's fees, multiple damages, and such other relief as may be warranted.

125.     Moreover, as stated at the outset of this Complaint, Mills stands with one foot in a civilization given to the private ownership of land and the other foot in a native culture to which such an idea is alien.  The mere historical domination of the one point of view over the other should not, as a matter of fundamental fairness, be allowed to block the few opportunities Native Americans have to hold on to and thus preserve the lands they deem sacred—especially when other alternatives are available.  Mills therefore

asserts that to look only as far as the laws of a mainstream culture that views her as the owner of the property and not beyond to a native culture that views the property as something far more significant and communal is merely to run a repeat performance, in new attire, of an old injustice. Given the abiding value placed upon connectedness to place and person within the Native American culture of which Mills is a part, the attempt by U.S. Bank and OneWest to take the property from Mills is, in effect, very much an attempt to possess and eventually sell a part of the culture and tradition of which she is an integral part, and should thus be viewed as a violation of her civil rights.

## COUNT 14, UNCLEAN HANDS

126.    Mills incorporates by reference herein paragraphs 1 through 124 of this Complaint.

127.    OneWest and U.S. Bank assert that Mills has breached the terms of the note and mortgage and yet they have pursued a foreclosure entirely without legal right, in effect asserting that while Mills should be held to the letter of the law, they should not. This is repugnant to our system of justice and an affront to the fundamental principles of equity on which that system largely rests. As a result of the acts and omissions of OneWest and U.S. Bank, Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 15, DAMAGE TO REPUTATION

128.    Mills incorporates by reference herein paragraphs 1 through 127 of this Complaint.

129.    In the process of foreclosing without legal right and by purchasing the property, OneWest and U.S. Bank have, respectively caused Mills to suffer harm to her reputation by, among other things, publishing her alleged debt and default in a newspaper of local circulation and by naming her in a Servicemembers action and subsequent District Court summary process action.  As a result, Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 16,  BAD FAITH

130.    Mills incorporates by reference herein paragraphs 1 through 129 of this Complaint.

131.    Mills made repeated efforts to secure a loan modification on fair and reasonable terms from IndyMac, whose portfolios were later taken over by OneWest.

132.    She was in fact approved for modification, but it was never honored and in any event consisted of draconian terms that would have resulted in her monthly payments jumping to $2,643.95.[7]  When she realized that nothing was happening, she contacted OneWest and was brushed off.  To this day she has received no explanation as to why her modification was never honored.

133.    Mills continues to stand ready to accept a modification that is fair and reasonable in light of today's marketplace but neither OneWest nor U.S. Bank are willing for her to have one but have instead pursued a course of foreclosure and eviction.  Given the totality of the circumstances in the present case this constitutes an act of bad faith as a result of which Mills has suffered and continues to suffer direct and consequential harm for which she is entitled to all appropriate relief.

---

[7] Mills also received approval for a second, much smaller modification, also from IndyMac.

## COUNT 17, ESTOPPEL

134.     Mills incorporates by reference herein paragraphs 1 through 133 of this Complaint.

135.     For any or all of the reasons previously stated, Mills respectfully requests that U.S. Bank be estopped from asserting ownership of the property, and from taking any further action with regard to the property, either directly or through its agents.

## COUNT 18, FRAUD UPON THE COURT, ABUSE OF PROCESS

136.     Mills incorporates by reference herein paragraphs 1 through 135 of this Complaint.

137.     The bringing of a Servicemembers Action in the Land Court by OneWest and a subsequent summary process action in the District Court by U.S. Bank without legal ownership of the mortgage and note each constitute a fraud upon the Court and an abuse of process as a result of which Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 19, SLANDER OF TITLE

138.     Mills incorporates by reference herein paragraphs 1 through 137 of this Complaint.

139.     The exercise of the power of sale by the Defendants without legal right was malicious, did not effect a transfer of title in the property from Mills, and constitutes a slander of title as a result of which Mills has suffered direct and consequential harm for which she is entitled to all appropriate relief.

## COUNT 20,  DECLARATORY RELIEF, M.G.L. c. 231A, § 1; 28 U.S.C. §2201

140.    Mills incorporates by reference herein paragraphs 1 through 139 of this Complaint and respectfully asks that the Court make the following binding declarations:

(a)    That for OneWest to service the loan on behalf of the Trust, the Trust (that is, U.S. Bank as trustee) would have to have first owned the mortgage loan.

(b)    That there is no assignment from MERS to the Trust, either individually or as nominee.

(c)    That because OneWest sold the property to U.S. Bank as Trustee in 2011, the Trust did not own the mortgage loan while it was being serviced by OneWest.

(d)    That the Trust did not assign the mortgage and note to OneWest because the Trust did not hold either the mortgage or the note.

(e)    That OneWest did not hold the mortgage or the note when it initiated the foreclosure process, nor has it ever held the mortgage or the note.

(f)    That OneWest did not have the authority to exercise the power of sale on behalf of the Trust.

(g)    That the purported assignment of April 23, 2009 is a nullity because there are no proper written assignments from each successive owner of the mortgage and the note.

(h)    That the purported assignment of April 23, 2009 was not confirmatory in nature because there was no prior assignment to confirm.

(i)    That because of the complexity and uncertainty of the underlying issues and circumstances under which it was produced and signed, the assignment is beyond reformation, and unenforceable.

(j)    That the Servicemembers judgment and any and all other documents predicated on OneWest's purported ownership of the mortgage and note are null and void.

(k)    That the equity of redemption was not foreclosed and remains with Mills.

(l)    That ownership of the note has not been established to a requisite degree of truth and certainty, and that the note is in any event unsecured.

(m)    That neither U.S. Bank nor OneWest suffered default, are not a real parties in interest, and have no right to collect monies allegedly due on the note.

(n)     That OneWest did not become a holder of the promissory note because:

     (i)      The note does not contain the requisite endorsements.

     (ii)     The note was in arrears at the time of the assignment and therefore no longer a negotiable instrument within the meaning of the UCC.

     (iii)    The assignment was the product of fraud; therefore the note is not a negotiable instrument within the meaning of the UCC.

(o)     Such other binding declarations as the Court may in its discretion make in her favor.


## COUNT 21, DECLARATORY RELIEF, M.G.L. c. 231A, § 1; 28 U.S.C. §2201

141.    Mills incorporates by reference herein paragraphs 1 through 139 of this

Complaint and respectfully asks that the Court make the following binding declarations:

(a)     That G. L. c. 183, § 54B must be harmonized with G. L. c. 183, § 21, G. L. c. 244, § 14 and other statutes relating to foreclosure by exercise of the power of sale, or it must be declared unconstitutional as applied for effecting a deprivation of Mills's right to substantive and procedural due process.

(b)     That to construe G. L. c. 183, § 54B so as to bar Mills from challenging the integrity and propriety of the chain of legal title to her property would be to allow G. L. c. 183, § 54B to be used as a conduit for fraud, both statutory and at common law, and as a license to contravene public policy.

(c)     That pursuant to G. L. c. 183, § 54B, while the person signing and acknowledging an assignment of mortgage need only purport to be doing so for the holder of the mortgage, the holder must in fact be the holder and cannot itself merely purport to be the holder.

(d)     That pursuant to G. L. c. 183, § 54B, if the assignor of a mortgage assignment is not in fact the holder of the mortgage, the assignment is a nullity even though the person signing and acknowledging need only purport to be signing for the assignor.

(e)     Such other binding declarations as the Court may in its discretion make in her favor.

## COUNT 22,  DECLARATORY RELIEF, M.G.L. c. 231A, § 1; 28 U.S.C. §2201

142.    Munroe incorporates by reference herein paragraphs 1 through 139 of this Complaint and respectfully asks that the Court make the following binding declarations:

(a)    That an agent cannot act on behalf of its principal with regard to an interest the principal does not already own; therefore:

    (i)    The fact that consecutive holders of the mortgage in the present case all use MERS as their common agent cannot and does not in itself transfer ownership of Munroe's mortgage from one consecutive holder to the next, and that any assertion to the contrary is wholly without support in the law.

    (ii)    Ownership of the Mills mortgage had to be transferred directly from the previous owner to the current owner before MERS could, on the current owner's behalf, assign the mortgage to OneWest.

    (iii)    Whereas an assignment of mortgage is the transfer of an interest in land, absent a valid assignment from the previous owner to the current owner the continuing designation of MERS as the mortgagee of record (solely as nominee) at the land office in the present case was a false representation of material fact.

    (iv)    Absent a valid assignment from the previous owner to the most recent owner, MERS could not, on behalf of the most recent owner, assign the mortgage to OneWest.

    (v)    Absent a valid assignment from the previous owner to the most recent owner, the assignment by MERS to OneWest on the most recent owner's behalf is fraudulent, null, and void for want of an interest to assign.

    (vi)    Absent a valid assignment from the previous owner to the most recent owner, OneWest took nothing and had no right to exercise the statutory power of sale.

(b)    That a mortgage divides the interest in a secured property into a "legal part" and an "equitable part" (the equity of redemption).  By stating that MERS can hold the "legal" part while an unnamed person holds the "beneficial" part is to divide an already divided interest.  MERS therefore attempts to create new law by asserting that the legal interest itself may be further divided into "legal" and "beneficial" interests.  The concept makes even less sense given the functional identity between principal and agent—that is to say, when MERS acts as nominee it is acting on behalf of the beneficial owner, which necessarily means that the beneficial owner owns the entire undivided legal interest in the secured property.

(c)     That the mortgage contract refers to MERS but once as *the* mortgagee; that MERS has made it clear that it does not hold the beneficial interest in the mortgage; that the mortgage contract itself contains many references to MERS as a nominee; that MERS attempts an end run around the conflict between roles of principal and agent by further dividing the mortgage—that is to say, the legal interest in the secured property—into a "beneficial" interest and a "legal" interest, thus arbitrarily creating new law where none in fact exists.

(d)     Such other binding declarations as the Court may in its discretion make in her favor.

## COUNT 23, INJUNCTIVE RELIEF

143.    Mills incorporates by reference herein paragraphs 1 through 139 of this Complaint.

144.    As a result of the actions by U.S. Bank, OneWest, and their agents, Mills has suffered and continues to suffer extreme hardship and is now facing an impending and irreparable injury:  the permanent loss of her home to a wrongful foreclosure and a wrongful eviction.

145.    Mills has no adequate or speedy remedy at law for the conduct previously described and for the impending and irreparable harm she stands to suffer.  This request for injunctive relief is her only means for securing relief.

Mills therefore requests that this Court:

(a)  Issue a preliminary injunction ordering U.S. Bank and OneWest, their officers, agents, employees, and successors, and all those in active concert or participation with them, to refrain immediately and pending the final hearing and determination of this action from taking any further action with regard to the property.

(b)  Issue a permanent injunction perpetually enjoining and restraining U.S. Bank, OneWest, and their officers, agents, employees, and successors, and all those in active concert of participation with them, from the conduct complained of herein; and,

(c)  Award Mills such other and further relief as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

**WHEREFORE**, based upon any one or more of the facts and allegations set forth in this Complaint, and upon whatever additional factors the Court may in its wisdom and discretion apply, Mills respectfully requests the following:

1.      That judgment be entered in her favor, with prejudice to the Defendants U.S. Bank and OneWest, with regard to Counts 1 through 21 of this Complaint and that she be awarded direct and consequential damages and costs, including forensic and other expert fees, attorney's fees, and such other relief as the Court may deem fair and appropriate and in an amount the Court may deem fair and appropriate.

2.      That such binding declarations be made as are set forth in Counts 20, 21, and 22 of this Complaint.

3.      That injunctive relief be granted upon the terms set forth in Count 23 of this Complaint.

RESPECTFULLY SUBMITTED,
The Plaintiffs, by their Attorneys,


/s/ Rockwell P. Ludden
Rockwell P. Ludden, Esq. BBO# 549478
Ludden & Kramer
PO Box 251
Yarmouth Port, MA 02675
508.398.8301
rpl@luddenkramerlaw.com


/s/ Colleen H. Kramer
Colleen H. Kramer, Esq.
BBO# 552107

Dated June 29, 2012

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non registered participants on June 29, 2012,


<u>s/s Rockwell P. Ludden</u>
Rockwell P. Ludden, Esq.

## <u>VERIFICATION OF PLEADING</u>

I, Rhonda G. Mills, Plaintiff in the above-captioned action, hereby depose and state that that I have read and subscribed to the foregoing Complaint, and that the facts set forth therein are based on my own personal knowledge and are true and correct.

 Signed under the penalties of perjury on this 29th day of June, 2012.


<u>/s/ Rhonda G. Mills</u>
Rhonda G. Mills